In re Cletus Bernard ARCHAMBAULT,
Debtor.

Cletus Bernard ARCHAMBAULT and
Karen Archambault, Plaintiffs,

v.

Scott S. HERSHMAN, Defendant.

Bankruptcy No. SK94–80648.
Adv. No. 94–8220.

United States Bankruptcy Court,
W.D. Michigan.

Nov. 16, 1994.

William L. LaBre, Edwardsburg, MI, for plaintiffs.

Andrew J. Vorbrich, Kalamazoo, MI, for defendant.

## MEMORANDUM OF OPINION GRANTING PLAINTIFFS' PETITION FOR PRELIMINARY INJUNCTION

JO ANN C. STEVENSON, Bankruptcy Judge.

This adversary proceeding arises in a bankruptcy case referred to this Court by

the Standing Order of Reference entered in this district on July 24, 1984 and is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O). Accordingly, this Court is authorized to enter a final judgment or order subject to those appeal rights afforded by 28 U.S.C. § 158.

Having established the necessary jurisdictional requirements, we turn to the gravamen of this adversary proceeding commenced by Chapter 7 individual Debtor, Cletus B. Archambault and his nondebtor spouse Karen Archambault against creditor Scott S. Hershman. At issue is whether and under what circumstances the bankruptcy court can employ 11 U.S.C. § 105(a) in an individual Chapter 7 to issue a preliminary injunction enjoining a creditor from continuing litigation against a nondebtor. Although a surfeit of cases deal with this issue within Chapter 11, the Court is not aware of any case law addressing this issue within the context of Chapter 7. Accordingly, we write on a clean slate and hold that injunctive relief is appropriate under the proper circumstances such as in this case.

■■■ This memorandum of opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052 and supersedes the opinion delivered from the bench on August 1, 1994.[1]

## PROCEDURAL BACKGROUND

This adversary proceeding does not come before the Court unencumbered by prior litigation. To have a clearer picture of the catalyst for this lawsuit, it is necessary to first summarize the relevant facts not only of the bankruptcy litigation but also the Texas litigation which preceded the bankruptcy filings.

### The Texas Litigation

Cletus B. Archambault ("Archie") was the president, chief employee, and 100% stockholder of V–8 Archie, Inc. ("V–8 Archie"), a Michigan corporation which assembled and sold replica cars and custom auto parts. Karen Archambault ("Karen") is Archie's wife. Archie and V–8 Archie agreed to build a Lamborghini Countach replica on a Fiero body for Scott A. Hershman ("Hershman"). Hershman did not find the final product acceptable and attempts by Archie and V–8 Archie to alter the vehicle to his satisfaction were unsuccessful. At some point Hershman's frustration and dissatisfaction propelled him to file a lawsuit with the District Court of Dallas County, Texas, 192nd Judicial District (the "first Texas lawsuit") naming Archie, V–8 Archie, and Karen as defendants. That lawsuit alleged breach of contract and sought a judgment of some $44,000 as to Archie, Archie's wife Karen[2] and V–8 Archie.

While the first Texas lawsuit was pending, the Court understands that in June of 1993 the parties reached a settlement of sorts memorialized in the documents entitled Settlement Agreement and Mutual Release ("Settlement Agreement") and Agreed Judgment. According to the Settlement Agreement, the vehicle was to be returned to Archie who would use his best efforts to try to sell it. The proceeds from any sale would be turned over to Hershman and applied to the amount stated in the Agreed Judgment. Concomitantly, Archie and V–8 Archie would make payments to Hershman based on a percentage of V–8 Archie's monthly gross sales, at a minimum of $500.00 a month. The first Texas lawsuit would be dismissed with prejudice as to Defendant Karen upon her execution and filing of a dismissal of her counterclaim against Hershman. The

---

1. On August 10, 1994 Hershman filed his Notice of Appeal of the August 2, 1994 Order for Preliminary Injunction. Although it may be somewhat unusual to issue a written opinion after the filing of the notice of appeal, this procedure is not without precedent. *See In re Garner*, 113 B.R. 352, 353 (Bankr.N.D.Ohio 1990); *In re Copeland*, 154 B.R. 693, 695 (Bankr.W.D.Mich.1993); and *In re Piper Aircraft Corp.*, 162 B.R. 619, 622

(Bankr.S.D.Fla.1994). As the appeal is still in the preliminary stages, we conclude that the release of this opinion will not impede the progress of the appeal.

2. There has never been a satisfactory explanation as to why Karen Archambault was named as a party defendant in the first Texas lawsuit.

Agreed Judgment was placed in escrow to be returned to Defendants Archie and V–8 Archie once the debt was paid in full, whether as a result of the sale of the vehicle, the monthly payments, or both. At such time Hershman would dismiss the first Texas lawsuit with prejudice as to the remaining Defendants.

Although Hershman received three checks of $500 each, business was such that neither Archie nor V–8 Archie was able to continue making the installment payments. No one purchased the vehicle and Hershman was unwilling to take the vehicle back. After several months of unfruitful discussion and negotiation, on December 30, 1993, Hershman filed the Agreed Judgment with the District Court of Dallas County, Texas, 192nd Judicial District. On that day, the Notice of Nonsuit with Prejudice was also filed in compliance with Paragraph XI of the Settlement Agreement.

On January 28, 1994, Hershman commenced the second Texas lawsuit alleging breach of the Settlement Agreement, fraud as to the Settlement Agreement, negligent misrepresentation, and conspiracy to commit fraud. Again, the defendants were Archie, Karen and V–8 Archie. Count five specifically sought reformation of the Agreed Judgment so as to require all three defendants (including Karen) to pay the sum of $49,000 plus attorney's fees and costs of court.

### The Bankruptcy Litigation

Unable to reach a satisfactory accord with Hershman, Archie and V–8 Archie each filed Chapter 7 on February 16, 1994. Necessarily and pursuant to § 362(a) these filings automatically stayed continuation of the second Texas lawsuit as to the Debtors.

Hershman countered by filing "Plaintiff's First Amended Original Petition and Bill of Review" in the second Texas lawsuit. This amended petition was identical to the original petition except that it now sought relief as to Karen only.

On May 2, 1994 Hershman filed his Motions for Relief from Stay in both Archie's and V–8 Archie's bankruptcies.

The first encounter this Court had with these litigants was regarding the Chapter 7 Trustee's Applications for Public Auction Sale filed in both cases. Hershman filed his objections claiming that as the vehicle was his, the Trustee could not sell it as part of the auction. Specifically, Hershman argued that (1) he, not the estate, owned the vehicle; (2) at the very least, he held equitable title to the vehicle which precluded the estate from selling it; and (3) since the issue of ownership had not yet been resolved, the public auction should not proceed.

At the June 6, 1994 hearing on Hershman's Objections to the Trustee's Application for Public Auction Sale, the Court pointed out that 11 U.S.C. § 363(f)(4) permits the Trustee to sell property of the estate free and clear of any interest in property if "... such interest is in *bona fide* dispute". Since the vehicle was titled to the Debtor and Hershman's name did not appear on the title either as a co-owner or secured creditor, Hershman's interest, if any, was in bona fide dispute. His Objections were denied and the Court signed the Order Allowing Trustee to Conduct Auction Sale. That Order further provided that the sale proceeds would remain in escrow pending further order of the court.

On June 7, 1994, Hershman filed a "Complaint Objecting to Discharge, to Determine Dischargeability of Debt, to Dismiss, for Turnover of Non–Estate Property, and for Equitable Subordination" in each of the two bankruptcy cases.[3]

The June 13, 1994 final hearing on Hershman's May 2, 1994 motions to lift stay was enlightening. Having initially verified that the vehicle had been turned over to the Chapter 7 Trustee for liquidation,[4] the Court then turned its attention to the parties' dispute. It was clear that any claims that Hershman believed he had against these two

---

**3.** This Court *sua sponte* issued its June 10, 1994 "Order Dismissing Counts II (nondischargeability) and III (objections to discharge) of Plaintiff's Complaint" as to the adversary proceeding commenced against corporate debtor V–8 Archie.

**4.** According to the Chapter 7 Trustee, the vehicle sold for $19,000.

debtors were more properly litigated within the two adversary proceedings he had filed in the bankruptcy court. The two valid issues were: the interest, if any, of Hershman in the vehicle or its sale proceeds, and whether the Chapter 7 of either Archie or V–8 Archie was filed in bad faith. Understanding the background and nature of this dispute raised serious questions as to the true purpose of Hershman's attempt to continue the second Texas litigation despite the intervening bankruptcies. Both motions to lift stay were summarily denied and orders to that effect were entered.

After ascertaining that Hershman both understood that the stay did not apply to nondebtor Karen, and that he intended to continue to pursue Karen in the second Texas lawsuit, the Court remarked that there was no authority to extend the automatic stay of Section 362 to this nondebtor. As instructed by the Sixth Circuit in *Patton v. Bearden,* 8 F.3d 343 (6th Cir.1993), when the stay has been extended to non-debtors, it has been done by way of Section 105(a) injunctive relief afforded by the Bankruptcy Court after a full hearing.

These statements did not fall on deaf ears. On June 30, 1994, Debtors' counsel filed a complaint seeking entry of a temporary restraining order and a preliminary injunction enjoining Hershman from proceeding against Karen in the second Texas lawsuit. As the complaint fully complied with FED. R.BANKR.P. 7064(b), the Temporary Restraining Order was signed on July 26, 1994, and the preliminary injunction was set for hearing at 1:30 p.m. on August 1, 1994.

## LEGAL ANALYSIS

■ Plaintiffs seek injunctive relief pursuant to the bankruptcy court's equitable powers emanating from Section 105(a) of the Bankruptcy Code.[5] These powers are important in the general bankruptcy scheme because they allow courts to be innovative and original. We well recognize, however, that

these powers are not without limits. The Supreme Court has instructed that "... [w]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). A bankruptcy court cannot use its equitable powers to disregard unambiguous statutory language. *In re C–L Cartage Co., Inc.,* 899 F.2d 1490, 1494 (6th Cir.1990). And courts have refused to grant injunctive relief where such relief would conflict with the mandates of the Bankruptcy Code. *Childress v. Middleton Arms (In re Middleton Arms Ltd. Partnership),* 934 F.2d 723 (6th Cir.1991). Accordingly, we cannot use Section 105(a) to circumvent the clear directive of § 327(a), *Id.;* we are precluded from using it for extending the explicit time period of § 365(d)(4), *In re Southwest Aircraft Services, Inc.,* 53 B.R. 805 (Bankr. C.D.Cal.1985); to further extend the already expired redemption period of § 108(b), *In re Charles M. Young,* 48 B.R. 678 (Bankr. E.D.Mich.1985); to override the specific prohibition of 26 U.S.C. § 7421(a), the Anti-Injunction Act, *In re Mildred Ellen Pressimone,* 39 B.R. 240 (Bankr.N.D.N.Y.1984); to empower the court to select and approve a trustee in contravention of § 1104(c), *In re Plaza de Diego Shopping Center, Inc.,* 911 F.2d 820 (5th Cir.1990); or to permit the filing of an untimely proof of claim, *In re Coastal Alaska Lines, Inc.,* 920 F.2d 1428 (9th Cir.1990).

This Debtor, however, does not seek relief which either conflicts with or is in disregard of unambiguous statutory language. Rather, he seeks preliminary injunctive relief which will give him the ability to benefit, at least temporarily, from the "fresh start" afforded by filing for bankruptcy.

■ Four factors must be considered in determining whether to grant or deny a motion for preliminary injunction: (1) the likeli-

---

**5.** 11 U.S.C. § 105(a) states as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed

to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

hood that movant will eventually prevail on the merits: (2) whether the injunction will save the movant from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction. *Unsecured Creditors' Comm. v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223, 1228 (6th Cir. 1985). These four factors must be balanced; they are not prerequisites to be met. The Sixth Circuit continues to reaffirm these four factors, *Southern Milk Sales, Inc. v. Martin, et al.*, 924 F.2d 98 (6th Cir.1991); *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir.1982), and *Dean Witter Reynolds, Inc. v. M.C. McCoy, et al.*, 995 F.2d 649 (6th Cir.1993). There is authority to support the conclusion that irreparable harm to the plaintiff and harm to the defendant are the two most important components of this analysis. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir.1991).

Although *Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.)*, 21 B.R. 777 (Bankr.D.N.M.1982) is not the first bankruptcy opinion to decide when Section 105(a) can be used to enjoin actions against nondebtors, it, along with the District Court's affirming opinion *Otero Mills, Inc., v. Security Bank & Trust, (In re Otero Mills, Inc.)*, 25 B.R. 1018 (D.N.M.1982) is the opinion with which most courts begin their analysis. In *Otero Mills*, the debtor sought an injunction to prevent a creditor from pursuing a state court action on a debt guaranteed by the debtor's president and shareholder. In issuing the injunction, the bankruptcy court stressed that the power to enjoin actions against third parties could only be exercised in limited circumstances.

> To so enjoin a creditor's action against a third party, the court must find that the failure to enjoin would affect the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor through that third party (citations omitted) ... This power to enjoin assures that a creditor may not do indirectly that which he is forbidden to do directly. According-

ly, 11 U.S.C. § 105 permits this Court to enjoin a creditor's action against a third party codebtor or guarantor when the proper showing is made by the party requesting the injunction.

21 B.R. at 778.

In granting the relief sought, the *Otero Mills* bankruptcy court examined the three factors which the debtor must demonstrate in order for the court to enjoin a creditor's action against a nondebtor: irreparable harm to the bankruptcy estate if the injunction does not issue; strong likelihood of success on the merits; and no harm or minimal harm to the other party or parties. *Id.* at 779.

Affirming on appeal, the Hon. Juan G. Burciaga explained that the threshold jurisdictional requirement is met when the "... failure to enjoin would effect [sic] the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor through that third party." 25 B.R. at 1018.

The decisions following *Otero Mills* have employed Section 105 to issue injunctions on behalf of nondebtors under a variety of circumstances: (1) where the nondebtor owns assets which will either be a source of funds for the debtor or where the preservation of the nondebtor's credit standing will play a significant role in the debtor's attempt to reorganize; (2) where it can be shown that the nondebtor's time, energy, and commitment to the debtor are necessary for the formulation of a reorganization plan; or (3) where the relationship between the nondebtor and debtor is such that a finding of liability against the nondebtor would effectively be imputed to the debtor, to the detriment of the estate. *See generally* 2 COLLIER ON BANKRUPTCY ¶ 105.02 at 105–9 (Lawrence P. King, ed., 15th ed. 1994).

An example of the first rationale for extending the stay is contained in *Old Orchard Inv. Co., v. A.D.I. Distributors, Inc. (In the Matter of Old Orchard Inv. Co.)*, 31 B.R. 599 (W.D.Mich.1983).[6] In *Old Orchard* the Hon. Douglas W. Hillman affirmed the bankruptcy

---

**6.** *Old Orchard* is precedent that using Section 105(a) to grant injunctive relief to nondebtors does not circumvent the clear direction of any Code sections. *In re Childress v. Middleton*

*Arms*, 934 F.2d at 725 ("Section 105(a) cannot be used to circumvent the clear directive of Section 327(a)".

court's use of Section 105(a) to enjoin an action against partners of the debtor partnership. Judge Hillman explained, "If the claim brought against the individual partners is one that was or could be filed against the debtor partnership, allowing the creditor to collect from the partner without the permission of the bankruptcy court effectively allows the creditor an end-run around the automatic stay." 31 B.R. at 602.

■ An illustration of the third rationale for extending the stay is found in *In re Johns–Manville Sales Corp.*, 710 F.2d 1194 (6th Cir.1983). In discussing *Royal Truck & Trailer v. Armadora Maritima Salvadorena*, 10 B.R. 488 (N.D.Ill.1981), the court remarked that "... there are cases under 362(a)(1) where a bankruptcy court may properly stay the proceedings against non-bankrupt co-defendants." The court added that in order for this relief to be available, there must be "... unusual circumstances.... something more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties." Where, for example a debtor or nondebtor are so close that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code. In such a situation, the debtor's protection must be extended to prohibit litigation against others if the result would be binding upon the debtor's estate. This should be so whether the debtor is a party or not. *See In re Metal Center*, 31 B.R. 458 (Bankr.D.Conn.1983).

The Court is well aware that, as to non-debtors, the issue of either extending the automatic stay or granting injunctive relief pursuant to Section 105(a) has uniformly been raised and decided within the context of Chapter 11. One of the rationales for granting such relief in Chapter 11 is that the non-debtor seeking to be brought within the stay's protection has an important role to play vis-à-vis the ability of the debtor to propose and effectuate a Chapter 11 plan of reorganization. As explained in *In re Sudbury, Inc.*, 140 B.R. 461, 464 (Bankr.

N.D.Ohio 1992), "... [i]n a bankruptcy context, irreparable harm may be discerned if 'the action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's reorganization effort.'" *Citing Baldwin–United Corp. v. Paine Webber Group, Inc. (In re Baldwin–United Corp.)*, 57 B.R. 759, 768 (S.D.Ohio 1985) *quoting In re Anje Jewelry Co., Inc.*, 47 B.R. 485, 487 (E.D.N.Y.1983)). *See Lomas Financial Corp.*, 117 B.R. 64, 67 (S.D.N.Y.1990). This determination of irreparable harm has generally been made following a full evidentiary hearing.

Archie and V–8 Archie are Chapter 7, not Chapter 11, debtors. After much research and examination, we have uncovered no published opinions extending the stay to non-debtors within the context of Chapter 7. Our analysis does not end there, however. As Justice Cardozo wrote many years ago

Insignificant is the power or innovation of any judge when compared with the bulk and pressure of the rules that hedge him on every side. Innovate, however, to some extent, he must, for with new conditions there must be new rules.

Nature of Judicial Process, 163 (1947).

## THE UNDERLYING FACTS

### *The Contents of the June 1993 Settlement Agreement and Mutual Release*

Even the most cursory reading of the document upon which the second Texas lawsuit is based reveals that Karen had no personal obligation on the Agreed Judgment to Hershman. The most telling evidence of the extremely limited nature of Karen's involvement in the underlying transaction is found in Paragraph 14 of the Settlement Agreement:

Karen Archambault, a named defendant in this case is executing this agreement solely to evidence her agreement to paragraphs 8, 10, and 11. *Karen Archambault shall not be personally obligated under any other portion of this Settlement Agreement and Mutual Release.* (emphasis added).

In Paragraph 8 Karen (and Archie) agreed to waive all jurisdictional issues and not con-

test the jurisdiction of the Texas Court should the Agreed Judgment be filed with that Court.

Paragraph 10 succinctly states,

Effective immediately following execution of this Settlement Agreement by all parties, Plaintiff (Scott Hershman) will immediately dismiss with prejudice, all claims and causes of actions against the defendant Karen Archambault, which were alleged or arise out of the Contract made the basis of Plaintiff's original petition.

Paragraph 11 dismissed with prejudice the defendants' counterclaim.[7]

As agreed, the defendants followed through and very shortly thereafter dismissed their counterclaims with prejudice. Karen did everything she agreed to do. She neither promised to make payments nor did she promise any other performance. She was, in fact, specifically excluded from these requirements by the language of both the Settlement Agreement and the Agreed Judgment.

### The August 1, 1994 Testimony

The testimony at the August 1, 1994 hearing established that Karen had virtually no connection to the business. This fact alone raises serious questions as to the motivation for naming her as a defendant in the second Texas lawsuit and speaks volumes as to the likelihood of that lawsuit's success.

Karen testified that she was not and had never been an employee, officer, stockholder or director of V–8 Archie and that her husband, Archie, was the sole owner and operator of V–8 Archie, Inc. She never worked for either her husband or V–8 Archie in a voluntary capacity, such as answering the phones. She never saw or met Hershman before seeing him that day in court. The only phone contact she ever had with Hershman was a telephonic deposition conducted from Texas relating to the first Texas lawsuit. She has never been to Texas. Her husband started the business in their home four to five years ago, moving the business to

a building in Mishawaka, Indiana in 1990 or 1991. She never talked to business customers and could not recall ever speaking with Hershman or any other customer or potential customer. She initially learned about Hershman when the first Texas lawsuit was filed. Before that, she remembered that her husband had mentioned trying to work something out with a customer. At no time did she ever conspire with either her husband or V–8 Archie to defraud Hershman. And she does not consider herself to be her husband's alter ego.

On cross-examination she reaffirmed that she never talked to business customers on the phone. She knew the general nature of her husband's business, knew in general what he did, and had seen ads that he has run. Other than the phone deposition, she had never had a phone conversation with Scott Hershman.

Archie testified that he never allowed his wife Karen to become involved in the business. In fact, she simply wasn't interested in his business. At the conclusion of the 1992 litigation and pursuant to the June 1993 Settlement Agreement and Mutual Release, Archie sent Hershman three checks of $500 each before running out of money.

Archie was visibly distraught on cross-examination. He stated that he was still trying to earn a living and was working from his home selling remodeled vehicles. Specifically, he is trying to sell a vehicle for a friend. For a period of time he did receive business calls at home but Karen refused to answer the home phone. He reaffirmed that Karen never received any salary or compensation from the business. Although he had some 80 or 90 phone conversations with Hershman, Karen did not participate in any of them.

Hershman testified that he purchased a vehicle from V–8 Archie in 1991 after he had spoken with Archie and one other company representative. He negotiated with Archie to build him a replica Lamborghini Countach on a fiero body for $44,000 to be paid in installment payments. The car was to be

---

7. There has been no explanation as to the basis of Archie and Karen's counterclaim against Hershman.

delivered in early 1992. When delivery was delayed, he called some time in early 1992 intending to cancel the contract because the car was late. By then he had paid some $20,000. He ultimately spoke to Karen who in some manner or other identified herself as Archie's wife. They exchanged pleasantries, and she said that Archie had talked to her about the car, it was his pet project, he was working on it day and night, and he had been in the business of putting together fancy cars for a while. Hershman testified that Karen said the cars "... looked terrific, extravagant, his reputation was known all over, and that Archie went to many shows". Hershman acknowledged that Karen gave him no details about the business. Following this and other conversations (none with Karen) Hershman advanced an additional $15,000 to $20,000 toward the purchase price.

The car was finally delivered in June, 1992. After a short inspection and drive around the block, Hershman observed that the car overheated, was too low to the ground, and couldn't be driven up his driveway and into his garage. It was "more like a race car". He thereupon demanded his money back. He and Archie negotiated for several months, with Hershman spending another $7,000 trying to both repair and modify the vehicle. Hershman thought he might have had one other telephone contact with Karen which consisted of her simply answering the phone and then turning it over to Archie.

On cross-examination Hershman reiterated that the second Texas lawsuit alleged that Karen was the alter ego of her husband and/or V–8 Archie, Inc. When questioned as to what facts he had as to his claim that Karen conspired with either Archie or V–8 Archie, Hershman could only point to the fact that all three defendants had been represented by the same attorney in the first Texas lawsuit and the subsequent drafting of the Settlement Agreement and Mutual Release.

### The Merits of the Second Texas Lawsuit

■ Although generally reluctant to comment on litigation pending before another court, we are compelled to analyze the merits of the second Texas lawsuit in order to determine whether the injunctive relief sought should be granted. While the possibility exists that Hershman may develop additional facts compelling a different result, at this point the second Texas lawsuit appears to be meritless. The testimony that Karen took no part in her husband's business was unrefuted. Even if the Court chose to believe Hershman's testimony as to the telephone call he made in early 1992 to cancel the car because delivery was late, all she could be guilty of was reporting that her husband enjoyed a good reputation, was busy working a lot of hours, and the vehicles he produced looked "terrific" and "extravagant". In point of fact, Hershman never objected to the "Lamborghini's" appearance.

The basis of the second Texas law suit is that Karen fraudulently induced Hershman, a practicing attorney, into signing the Settlement Agreement and Mutual Release. During cross-examination Hershman specifically pointed to Article VII of the Settlement Agreement and Mutual Release, which stated that,

> Defendants represent that V–8 Archie, Inc. and Cletus Archambault are solvent and will not declare bankruptcy before July 1, 1994.

According to Hershman, a review of the Debtors' bankruptcy schedules indicates that both debtors were not solvent when they signed the Settlement Agreement in June of 1993. Thus those statements made as to solvency were false and constitute fraud.

■ The elements of fraud are set forth in *Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813 (1976) (*quoting Candler v. Heigho,* 208 Mich. 115, 121, 175 N.W. 141 (1919)) and cited by this Court in *In re Auto Specialties Mfg. Co.*, 153 B.R. 457, 506 (Bankr.W.D.Mich.1993).

> The general rule is that to constitute actionable fraud it must appear: (1) that defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intent that it should be acted upon by plaintiff; (5) that plaintiff

acted in reliance upon it; and (6) that he thereby suffered injury.

Each of these six elements must be proved by clear and convincing evidence. *Schwartz v. Electronic Data Systems, Inc.*, 913 F.2d 279, 285 (6th Cir.1990).

For purposes of our analysis we assume without deciding that Hershman's interpretation of both debtors' bankruptcy schedules is correct when viewed retroactively to June 1993, and that the representation in the Settlement Agreement as to the solvency of the debtors was a material misrepresentation on which Hershman relied. We further assume without deciding that the clear, unambiguous language of Paragraph 14 of the Settlement Agreement quoted above, means other than what it says in limiting Karen's liability in signing that document. Our first inquiry must be, did Karen make the solvency representation as to herself or did she make it as to Archie and V–8 Archie, Inc. Giving Hershman the benefit of the doubt and assuming without deciding that the latter part of that inquiry is answered in the affirmative, the next hurdle which attorney Hershman must overcome is that of reasonable reliance.

 A misrepresentation requires reasonable reliance on a false representation. *See State–William Partnership v. Gale,* 169 Mich.App. 170, 425 N.W.2d 756 (1988). There can be no fraud where a person has the means to determine that a representation is not true. *Montgomery Ward & Co. v. Williams,* 330 Mich. 275, 47 N.W.2d 607 (1951); *Webb v. First of Michigan Corp.,* 195 Mich.App. 470, 474, 491 N.W.2d 851 (1992).

Hershman testified that he only had two contacts with Karen. The first was in early 1992 when they exchanged pleasantries on the phone and she stated her husband was working hard and made fancy cars. The second time was when upon answering the phone, she turned it over to Archie. We fail to see how based on these two incidents, and nothing more, attorney Hershman could reasonably rely on Karen's statements as to the solvency of either Archie or V–8 Archie.

 Hershman produced no evidence or law in support of his conspiracy theory. The sole basis of his claim was that because Karen, Archie and V–8 Archie, Inc. were represented by the same attorney who also drafted the June 1993 Settlement Agreement and Mutual Release, she was guilty of "conspiracy".

 Hershman's final argument was that the Defendants breached their promise not to file bankruptcy before July 1, 1994. Again, assuming without deciding that such a promise is valid and enforceable and not contrary to public policy,[8] Karen surely did not breach her promise, as she did not file bankruptcy. Since she was neither an officer, nor an employee, nor a shareholder, she had no authority to file bankruptcy on behalf of V–8 Archie. Thus she could neither prevent nor cause that corporate entity to seek bankruptcy relief. This is also true as to Archie. No testimony was presented that she had the legal authority to either stop or effectuate his individual Chapter 7 filing. We know of neither statute nor case law which gives an individual the authority or legal ability to either file for, or prevent the filing of, a spouse's Chapter 7 bankruptcy petition.

We can not help but conclude that the second Texas lawsuit filed against Karen is highly questionable and of dubious merit. Having been denied relief from the automatic stay, Hershman's true motivation for continuing the second Texas lawsuit against Karen is to be paid for his prepetition claims against the Debtors. Hershman admitted as much while testifying.

 Several exceptional circumstances warrant granting the Debtor's motion for a preliminary injunction. We find that because of the very close relationship between the Debtor and nondebtor the continuation of litigation against the nondebtor jeopardizes a basic principle of bankruptcy, that is the fresh start which the Bankruptcy Code af-

---

8. Ample case law exists suggesting that an agreement not to file bankruptcy is unenforceable because it violates public policy. *In re Club Tower,* 138 B.R. 307 (Bankr.N.D.Ga.1991); *In re Citadel* *Properties, Inc.,* 86 B.R. 275 (Bankr.M.D.Fla. 1988); and *In re Cheeks,* 167 B.R. 817 (Bankr. D.S.C.1994).

fords the Chapter 7 individual debtor. When asked, Hershman admitted that the real purpose for his second Texas lawsuit was to collect his $49,000 judgment from Karen, even though the judgment signed by Hershman explicitly provided that Karen was not liable. This litigation tactic is a textbook example of a creditor's impermissible attempt at "an end run around the automatic stay" viewed with disdain in *Old Orchard*, 31 B.R. at 602. Hershman's pre-petition claims against the Debtors will either be discharged or determined to be nondischargeable within the bankruptcy court's litigation of the two adversary proceedings Hershman has filed with this Court.[9]

We recognize that a final disposition of the merits of the second Texas litigation may be left to that Court at the appropriate time. We need not suspend reality, however, in deciding the very real financial impact on the Debtor and his spouse if they are forced to spend their already limited resources to not only defend the two bankruptcy adversary proceedings [10] but to also defend a frivolous lawsuit in Texas. As a member of the Illinois bar practicing law in Texas and appearing *pro se* in the second Texas lawsuit, Hershman is not subject to the same financial constraints as are the Debtor and his spouse.

Our analysis of the four factors stated in *DeLorean, supra*, three of which are identical to those set out in *Otero Mills*, do not compel a different result. We start first with the element of "whether the Debtor will be able to succeed on the merits". Because this relief has uniformly been sought within Chapter 11, success on the merits "has been evaluated in terms of the likelihood of a successful reorganization". *In re Sudbury, Inc.*, 140 B.R. at 464; *In re Baldwin–United Corp.*, 57 B.R. at 767; *In re Otero Mills, Inc.*, 21 B.R. at 779; and *In re Landmark Air Fund II*, 19 B.R. 556, 560 (Bankr.N.D.Ohio 1982). Where injunctive relief is sought

within a Chapter 7, "the likelihood of success on the merits" factor must be analyzed as to the possible success of the litigation which the debtor seeks to enjoin as well as the effect of that litigation on the debtor's fresh start. In this case there is a strong likelihood that Karen will ultimately prevail in her defense of the second Texas lawsuit.[11]

Bankruptcy provides the honest debtor the ability to start afresh, *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *In re Krohn*, 886 F.2d 123 (6th Cir.1989), through discharge of all or a portion of pre-petition debts. As the Supreme Court noted in *Hunt*,

> One of the primary purposes of the bankruptcy act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort.

*Hunt*, 292 U.S. at 244, 54 S.Ct. at 699, 78 L.Ed. at 1238. (Internal citations omitted).

The Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. *In re Jones*, 114 B.R. 917 (Bankr.N.D.Ohio 1990). To permit Hershman to continue his second Texas lawsuit against Karen based on his prepetition claims against the Debtors effectively denies Archie the "fresh start" which bankruptcy offers the honest but unfortunate debtor. This is but one example of irreparable harm which may ensue if the preliminary injunction is not issued.

---

9. Following the August 11, 1994 bench opinion which this written opinion supersedes, the parties presented for entry a stipulated Order for Dismissal on September 28, 1994. That Order dismissed with prejudice both of the pending adversary proceedings.

10. See footnote 9, *supra*.

11. It is not beyond possibility that a situation could exist where a balancing of the *DeLorean* elements would still warrant imposition of injunctive relief even though the lawsuit sought to be enjoined was meritorious.

■ It is disingenuous to argue that Karen's wages should be considered separately from that of her husband when, in fact, he has no wages. A continuation of the second Texas lawsuit will have a severe financial impact on Archie, as well as Karen. Karen testified that to date the second Texas lawsuit has cost her $15,000 to defend. And she has been advised by her attorney that if the lawsuit continues, she can expect to receive a bill for legal fees up to an additional $20,000. As is typical of most debtors, the Archambaults are not wealthy people. Karen currently earns an annual salary of $26,000 as an Operations Manager at Prudential Securities where she has been employed for some twelve years. Archie is trying to start another business, but as yet has not met with much success. Their legal fees are large, onerous, and continuing to climb. Karen is not able to simply write a check to pay for them. She testified that if she has to continue to defend the second Texas lawsuit, the legal fees alone may force her to file bankruptcy. This very real possibility constitutes irreparable harm.[12]

■ A preliminary injunction will not harm Hershman. Rather, it will simply require that he fully litigate his claims within the bankruptcy court. Either he has a valid interest in the vehicle's sale proceeds or he does not. Either he has a meritorious non-dischargeability claim as to Archie or he does not. Either he can prove that the bankruptcy of Archie and/or V-8 Archie should be dismissed as bad faith filings or he cannot.[13]

■ The public interest will be served by granting a preliminary injunction. Pursuing dubious law suits and thereby causing increased defense costs and attorney's fees which may ultimately result in yet another bankruptcy is not in the public interest. In these times of excessive litigation it surely can not be in the public interest to further clog the dockets of two courts and spend taxpayers' money on questionable litigation. Nor is it in the public interest to continue a cause of action which jeopardizes the "fresh start" which bankruptcy provides the honest debtor.

■ As noted in *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261, (6th Cir.1977) *quoting Adams v. Federal Express Corp.*, 547 F.2d 319, 322 (6th Cir.1976), the granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court. (citations omitted). On appeal the grant or denial of such an injunction will not be disturbed unless contrary to some rule of equity or an abuse of discretion. *United States v. Corrick*, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936).

## CONCLUSION

■ The Sixth Circuit has indicated that injunctive relief may be appropriate where the debtor and the non-debtor are closely related, *Patton v. Bearden*, 8 F.3d at 349. To this skeletal framework we would add that such relief is also appropriate where the underlying facts are extreme and the failure to grant such relief would effectively deny the Debtor the "fresh start" afforded by Chapter 7 by allowing the movant an end-run around the automatic stay. Necessarily, such relief should only be granted after the Court has conducted a full and complete hearing.

We are reminded of the Honorable Cornelia G. Kennedy's admonition in *In re Middleton Arms, Ltd., Partnership*, 934 F.2d at 725, "[t]he equitable powers of section 105(a) may only be used in furtherance of the goals of

---

12. We recognize that Karen retains the option of filing her own bankruptcy petition. While some might disagree, filing bankruptcy does not come without its own price. Moreover, in this case the bankruptcy option would be particularly troublesome where the financial difficulties warranting such a step have resulted from lawyer's fees incurred in defending a highly questionable lawsuit.

13. The fact that Hershman dismissed with prejudice his two bankruptcy adversary proceedings after this Court issued its order of preliminary injunction does not require a different analysis as to this element. In point of fact, the voluntary dismissal of both those lawsuits seriously calls into question Hershman's good faith in filing them in the first place and further supports this Court's conclusion that he is using the second Texas lawsuit to orchestrate an end run around those issues which are properly left to the bankruptcy court's determination.

the Code." Based on the facts presented here, the true motivations of Creditor Hershman, and the importance of protecting the "fresh start" which Chapter 7 offers the honest but unfortunate debtor, a preliminary injunction is not only warranted but necessary to preserve the integrity of the bankruptcy process. Plaintiffs' motion for a preliminary injunction is hereby granted and an order in conformity with this opinion will be entered.